IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | 4:11CR3034 |
| v. | ) | |
| | ) | **MEMORANDUM** |
| STEVEN MILES SULLIVAN, | ) | **AND ORDER** |
| Defendant. | ) | |

Steven Miles Sullivan filed a pro se motion pursuant to 28 U.S.C. § 2255. Upon initial review, I dismissed all claims (Filing No. 116) save for Sullivan's ineffective assistance of counsel claims regarding his trial counsel and his counsel on direct appeal, who was different than trial counsel.

I referred the matter to Judge Zwart to hold an evidentiary hearing. I appointed David Stickman, our Federal Public Defender, to represent Mr. Sullivan. Mr. Stickman personally handled this matter.[1]

This was a jury case that took only two days to try. It was about "bath salts" and whether Sullivan knew that the "bath salts" he possessed were in fact a controlled substance analogue. After reviewing the § 2255 motion, I was particularly concerned with trial counsel's failure to impeach a critical witness—a law officer who had stopped Sullivan's vehicle—with a prior inconsistent statement given under oath about Sullivan's knowledge and what Sullivan said during a traffic stop.

In essence, a deputy sheriff had testified at a suppression hearing that during a traffic stop, Sullivan had said "no" when asked whether he had anything illegal in his vehicle. However, at trial the officer left out the "no," giving the impression that

---

[1] I thank him for his excellent work and also for taking on this unpleasant task.

Sullivan knew that the "bath salts" in the vehicle, which Sullivan openly acknowledged possessing when speaking with the officer, were a controlled substance analogue.

When I sent this matter to Judge Zwart, I observed that the Court of Appeals, while addressing the sufficiency of the evidence claim, repeatedly emphasized the importance of the trial testimony of this witness, not knowing that he had given an important inconsistent statement when testifying at a suppression hearing. *United States v. Sullivan*, 714 F.3d 1104, 1105 (8th Cir. 2013) ("According to Parsons, he had asked during the stop if there was anything illegal in the vehicle and Sullivan had responded that the vehicle contained bath powder. Trial Tr. 183.").

The Court of Appeals stressed:

> A reasonable juror could find Sullivan knew he was in possession of a controlled substance analogue. When Parsons asked Sullivan whether the vehicle contained anything illegal, Sullivan told him the vehicle contained bath powder. Trial Tr. 183. At the time of the arrest, the mephedrone in the powder was illegal only under the CSAEA as a controlled substance analogue. . . . Accordingly, *Sullivan indicating the bath powder was illegal* supports a reasonable inference he knew the powder contained a controlled substance analogue.

*Id.* at 1107 (emphasis added).

Judge Zwart conducted an evidentiary hearing. After that, she issued Findings and Recommendation ("F & R") (Filing No. 141). She recommended that I deny and dismiss all the ineffective assistance of counsel claims. Sullivan has objected, and he

has submitted a brief. The government has not responded. With one very important exception that I will discuss in detail, I adopt Judge Zwart's F & R.[2]

I now find and conclude that retained trial counsel, Mr. Glenn Shapiro[3], was ineffective when he failed to impeach a police officer, who was *the* critical witness, with a thoroughly inconsistent statement given under oath; that Shapiro had no, and now claims no, reason for failing to do so; and that the failure to impeach this witness substantially undermines confidence in the jury verdict.[4] Accordingly, I will vacate the conviction and order the government to return to Sullivan the money forfeited to the government.

## BACKGROUND

On October 27, 2010, late in the evening, Sullivan was driving to Lincoln, Nebraska, when he was stopped and arrested by Officer Jason Parsons. At trial, Parsons, who had arrested Sullivan, testified about the stop. According to Parsons' trial testimony, he asked during the stop if there was anything illegal in the vehicle, and Parsons stated that Sullivan admitted that the vehicle contained "bath powders" and "K-2."[5]

---

[2]With respect to appellate counsel's performance, I add that he could not have properly raised the ineffectiveness of trial counsel claim on direct appeal because an evidentiary hearing was necessary to flesh out whether Shapiro had a reason for his failure to impeach and whether his inaction prejudiced Sullivan. *See*, *e.g*, *United States v. Schwarte*, 645 F.3d 1022, 1034-35 (8th Cir. 2011).

[3]I take no pleasure in this decision. Shapiro is a respected, experienced, able, and zealous criminal defense lawyer who has appeared before me numerous times.

[4]I presided over the trial.

[5]K-2 was not illegal under Nebraska or federal law at the time of the arrest. *See*, *e.g.*, Filing No. 104, p. 150; DEA Press Release, *DEA Moves to Emergency Control Synthetic Marijuana* (Nov. 24, 2010). Furthermore, Sullivan was not charged with a

During a subsequent search of the vehicle, Parsons seized, among other things, over $5,000 in cash, a 3x5 plastic bag containing 397 grams of a white powder, 100 2x2 sealable plastic bags, and sheets of two different kinds of labels corresponding to the size of the small plastic bags. Pictures of the labels were submitted into evidence. The text on the first type of label read "Experience the Bliss . . . Deluxe Bath Powder." The text on the second read "Pour 100-200 mg into Hot Bath. Kick back and Enjoy. Do not use more than ½ pack per bath. Experience the Bliss. . . . Products not for human consumption. Keep out of reach of children. Distributors not responsible for misuse of product."

The white powder contained mephedrone, a chemical analogue of methcathinone. Methcathinone was at the time of the arrest, and remains, a Schedule I controlled substance. However, at the time of the arrest, Nebraska law did not prohibit the possession or sale of mephedrone. Mephedrone was, however, illegal at the time as a controlled substance analogue under the federal Controlled Substance Analogue Enforcement Act (CSAEA) to the extent distributors intended it for human consumption. 21 U.S.C. § 802(32).

The jury trial was short. The government's case consisted of two chemists (one from the DEA and one from Nebraska), a DEA pharmacologist[6], an undercover cop from the Lincoln, Nebraska, police force, and Officer Parsons. Sullivan did not testify.

---

crime based upon the K-2.

[6]Dr. Cassandra Prioleau, a pharmacologist employed by the DEA, testified that mephedrone had a substantially similar effect on the central nervous system as methcathinone, a Schedule I controlled substance. (Filing No. 104, p. 75-76.) No further discussion of her testimony is necessary for resolution of this matter.

*Parsons' Testimony at Trial Was Inconsistent With His Sworn Pretrial Testimony*

There is no question that Parsons gave inconsistent sworn testimony on a critical issue. At a pretrial hearing before Judge Zwart, Parsons testified this way:

> A. . . . . I asked Mr. Sullivan if he had anything illegal . . . in his car.
>
> Q. Okay.
>
> A. And he said, "*No, I just have K2 and some bath powder.*"

(Filing No. 37, p. 30 (emphasis added).)

But, at trial, Parsons completely omitted the "no," and testified this way:

> A. . . . . I asked Mr. Sullivan, I said, "Is there" -- "Do you have anything illegal in your car?" And Mr. Sullivan said, "I have K2."
> . . .
>
> Q. After he said, "I have K2"?
>
> A. I said, "Is there anything else?"
>
> Q. And did he respond?
>
> A. And his response was, "Well, there's bath powders. . . ."

(Filing No. 104, pp. 182-83.)

Parsons clearly left the impression with the jury that Sullivan made an admission that he knew that "bath salts" were illegal. That was the government's view too.

For example, in the brief filed with the Eighth Circuit Court of Appeals, the government argued that "the jury could reasonably infer the 'bath powders' which *Mr. Sullivan admitted possessing when Deputy Parsons asked him if he had anything illegal in his car* were intended to have the same effect on the human body as methcathinone, and were meant for human consumption . . . ." (Ex. 102, Br. of Appellee at 26, *United States of America v. Sullivan*, Case No. 12-1754, (8th Cir. Sept. 26, 2012) (Entry ID: 3957089) (emphasis added).)

***Shapiro Had No Reason For Failing to Impeach Parsons***

At the evidentiary hearing on the § 2255 motion, Shapiro gave no credible reason for not impeaching Parsons with the inconsistent statement. He testified:

> Q. So it wasn't a matter of strategy that you were not wanting to impeach on that; it's just something that perhaps you didn't realize at the -- at the moment?
>
> A. Well, that and I think it came out through the trial and my arguments to the jury that Mr. Sullivan purchased those items legally online for legitimate business, and so there are other avenues, I believe, that covered what we thought was Mr. Sullivan's knowledge of that substance.

(Filing No. 140, p. 14.)

At another point, Shapiro testified:

> Q. In your opinion, is there any reason why you wouldn't impeach a witness with a prior inconsistent statement on an issue that is relating to your theory in the case?

> A. You say is there a reason I would not have?
>
> Q. Yes.
>
> A. You know, I -- I'm not sure, to be honest, at the time of trial when he made that statement I necessarily noted the difference between the two at that time. I'm not sure I saw that he testified differently between the two might be my reply to that.

(Filing No. 140, pp. 22-23.)[7]

As Judge Zwart found, "During the hearing on Defendant's § 2255 motion, Shapiro admitted he did not impeach Deputy Parsons with his prior inconsistent statement. And this failure was not a trial strategy but rather caused, at least in part, by an oversight." (Filing No. 141, p. 7.)

### *Shapiro Knew That Parsons' Testimony Was Critical*

It is important to remember that the government waited to put Parsons on last. Furthermore, Sullivan presented no testimony or other evidence. The jury began deliberations with Parsons' testimony keenly in mind. With these factors as background, Shapiro knew that Parsons' testimony was central to Sullivan's defense:

> Q. And if you could go to page 10 on your trial notes. I think we have the reference to Deputy James Parsons there.
>
> A. Yes.
>
> Q. Okay. That would be your notes of the testimony on direct as it's being elicited, is that correct?

---

[7]A transcript of the suppression hearing was available to defense counsel on August 10, 2011, long before trial. (Filing No. 37.)

A. That is correct.

Q. All right. Then about, again, three-quarters of the way down the page, there -- it looks like it says "anything illegal-K2," "anything else-bath powders," is that right?

A. Yes.

Q. So that would be referring to when Deputy Parsons was asking Mr. Sullivan during the traffic stop whether Mr. Sullivan had anything illegal in the car, correct?

A. His first question was "was there anything illegal?" He said, "K2." "Do you have anything else?" I suppose you could infer he meant illegal or just anything else in the vehicle, and I think Mr. Sullivan had told him, "I just have bath powder."

Q. Then we have the checkmark again to the right of that, is that –

A. That is correct.

Q. And again, that checkmark indicates that's an area that you want to cross-examine Deputy Parsons on –

A. Possibly, yes, sir.

Q. -- on that specific exchange between Deputy Parsons and Mr. Sullivan?

A. Yes.

Q. The Defendant in this case did actually talk with the officers after his arrest, is that what your recollection is?

A. He did.

> *Q. And so much of your defense in terms of what Mr. Sullivan was doing with the bath powders came with his conversation with Deputy Parsons after the arrest, is that fair?*
>
> *A. I think that's fair.*

(Filing No. 140, pp. 29-30) (emphasis added).

As Mr. Stickman pointed out, Shapiro's trial notes reflected the importance of Parsons' testimony and the need to cross-examine Parsons on that subject. The trial notes read this way:

> Anything illegal – K2
>
> Anything else – Bath powders ✓

(Def.'s Ex. 113, p. 10.)

Thus, Parsons skated through the cross-examination without the jury hearing that Parsons had given sworn testimony that Sullivan made no admission about illegality. In fact, the jury (and the Court of Appeals) did not know that Sullivan actually denied such knowledge, assuming that Parsons' testimony during the pretrial proceedings was believed.

***Undercover Cop's Testimony Cut Both Ways***

The government called Lincoln Police Department Officer Christopher Vigil. He testified that as part of his undercover work, he visited "head shops" to gather intelligence. After I heard his testimony, I remember clearly thinking that Vigil's testimony cut both ways.

He testified that while "bath salts" were not illegal under Nebraska law, and therefore, he made no attempt to seize them, he observed two types of "bath salts" being sold in "head shops." (Filing No. 104, pp. 141-143.) One type cost around $10 to $20, and the other type cost around $60. From the price discrepancy and the wording of the labels and the size of the powders within the packaging, Vigil inferred that the more expensive "bath salts" were intended to induce a "high," while the lower priced bath salts were legitimate. On the other hand, Vigil admitted that "bath salts" were at the time openly being sold in gas stations, convenience marts, and truck stops, in addition to "head shops." (Filing No. 104, p. 146.)

Vigil's testimony about "bath salts" may have caused suspicion in the minds of a reasonable jury. On the other hand, Vigil's testimony established that it was also true that consumers and retailers in Lincoln, Nebraska, evidently *did not* view their open use and sale of "bath salts" as the consumption or sale of an illegal controlled substance analogue under federal law. This later point fit in well with Sullivan's defense of lack of knowledge.

***The Government's Case Was Confusing Regarding the Nature of the Substance***

The grand jury returned an indictment charging Sullivan with possession with intent to distribute controlled substance analogues in violation of 21 U.S.C. §§ 802(32)(A), 813, and 841. Specifically, the indictment alleged:

> On or about October 27, 2010, in the District of Nebraska, STEVEN MILES SULLIVAN, the Defendant herein, did knowingly and intentionally possess with intent to distribute 3,4-methylenedioxymethcathinone *and* 4-methylmethcathinone, *both*[8] controlled substance analogues, as defined in Title 21, United States Code,

---

[8]Hereinafter, I will refer to 3,4-methylenedioxymethcathinone as "3,4" and 4-methylmethcathinone as "4."

10

> Section 302(32)(A), *to* methcathinone[9], a Schedule I controlled substance.
>
> In violation of Title 21, United States Code, Sections 813 and 841 (a)(1)(C).

(Filing No. 1, p. 1 (emphasis added).)

At trial, and under my questioning, a DEA chemist testified that the "3,4" was *not* an analogue to methcathinone.[10] (Filing No. 104 at pp. 55-56.) According to the DEA chemist, only the "4" was an analogue to methcathinone.

To make matters even worse for the government, it put on a chemist from the Nebraska State Patrol (NSP) who had never tested an alleged controlled substance analogue before testing the substance at issue. She first testified that based upon an e-mail from someone at the DEA, she believed that the "3,4" and the "4" were both analogues to methcathinone. But then, under further questioning by counsel and me, she seemed to retract her testimony that the "3,4" was an analogue to methcathinone. (Filing No. 104, at pp. 125-30.)

Had the jury known that Sullivan denied knowledge of the illegality when speaking with Parsons, the NSP chemist's halting and inconsistent testimony about the nature of the substance would have dovetailed nicely with Sullivan's claim of lack of knowledge. Moreover, if two chemists, one from the DEA and one from NSP, gave differing testimony about what the substance was, a jury might reasonably conclude that Sullivan's claimed lack of knowledge was perfectly reasonable.

---

[9]"Methcathinone" is also known as mephedrone.

[10]She testified that the "3,4" was analogous to MDMA, commonly known as "ecstacy."

Ultimately, the government conceded that the "3,4" was *not* an analogue to methcathinone. Accordingly, I instructed the jury that: "The government no longer claims that the defendant was in possession of 3,4-methylenedioxymethcathinone, a controlled substance analogue to methcathinone." (Filing No. 59 at p. 12.)

### *Knowledge Was an Essential Element*

Among other things, I instructed the jury that the government was required to prove beyond a reasonable doubt that the "[t]he defendant knew that he was in possession of a controlled substance analogue." (Filing No. 59, p. 10.) I defined what a "controlled substance analogue" was. (*Id*. at pp. 10-11.) That these instruction were correct cannot be disputed. *McFadden v. United States*, 135 S. Ct. 2298 (June 18, 2015) (reversing the Fourth Circuit, vacating the conviction, and holding that to convict a defendant of distribution of a controlled substance analogue, the government must prove that defendant knew the substance was controlled under federal law).

### *ANALYSIS*

The two-prong *Strickland* standard must be applied. *Strickland v. Washington*, 466 U.S. 668, 694 (1984) (announcing principles for evaluation of claims of ineffective assistance of counsel under the Sixth Amendment). In order to prevail on a claim that defense counsel rendered ineffective assistance of counsel under *Strickland* such that relief is warranted, the claimant must establish two things. He or she must establish (1) that "'counsel's representation fell below an objective standard of reasonableness,'" and (2) that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nguyen v. United States*, 114 F.3d 699, 703-04 (8th Cir. 1997) (quoting *Strickland*, 466 U.S. at 688-89).

Regarding the first prong, a judge's "scrutiny of counsel's performance must be highly deferential," and the judge must "indulge a strong presumption that

counsel's conduct falls within the range of reasonable professional assistance." *Reed v. United States*, 106 F.3d 231, 236 (8th Cir. 1997). In other words, a judge should make "every effort" to "eliminate the distorting effects of hindsight" by examining the lawyer's performance from "counsel's perspective at the time" of the alleged error. *Strickland*, 466 U.S. at 689.

Regarding the second prong, a "reasonable probability" is less than "more likely than not." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (citing *Nix v. Whiteside*, 475 U.S. 157, 175 (1986) ("[A] defendant need *not* establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland* "(emphasis added))). But, the showing must be compelling enough to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### *Counsel's Performance*

Under Fed. R. Evid. 801(d)(1)(A), "'[p]rior inconsistent statements by a witness are not hearsay and *are competent as substantive evidence* if the declarant testifies at trial and is subject to cross-examination concerning the statement, and the prior inconsistent statement was given under oath at a trial, hearing, or other proceeding.'" *United States v. Cervantes*, 646 F.3d 1054, 1060 (8th Cir. 2011) (emphasis added) (citing and quoting *United States v. Wilson*, 806 F.2d 171, 175-76 (8th Cir. 1986)). When Shapiro failed to impeach Parsons, he not only failed to attack Parsons' credibility on a critical issue (knowledge), but he also failed to present *substantive evidence of Sullivan's presumed innocence* to the jury.

Like Chief Judge Reade in a very similar case, I find and conclude that Shapiro's failure to impeach Parsons, a government agent and witness who was the lynchpin of the government's case, fell below the objective standard of reasonableness. *United States v. Stangeland*, No. 08-CR-4043-LRR, 2009 WL 1803132 (N.D. Iowa June 18, 2009) (vacating judgment where defense counsel missed the fact that a special agent for the government gave testimony at trial

inconsistent with sworn testimony before the grand jury regarding the critical issue of whether the defendant made an admission to the special agent). *See also Driscoll v. Delo*, 71 F.3d 701, 709-711 (8th Cir. 1995) (counsel was ineffective, in prosecution of prison inmate for murder of guard, by failing to impeach state's eyewitness with prior inconsistent statements; although eyewitness testified at trial that defendant made statement to eyewitness shortly after stabbing which tended to identify defendant as assailant, eyewitness was interviewed by two investigating officers shortly after incident and did not say that defendant admitted to stabbing victim, much less that eyewitness saw defendant stab victim).

I am unpersuaded by Judge Zwart's reasoning that despite this "oversight,"

> [u]pon review of the trial and suppression hearing transcripts, the undersigned magistrate judge is not convinced that Mr. Shapiro's representation fell below an objective standard of reasonableness. Defendant's trial was about bath powders, not K2. Based on Deputy Parsons' trial testimony, Sullivan admitted K2 was illegal. He then disclosed the presence of bath powders in response to the follow up question, "Is there anything else?" Had defense counsel attempted to impeach the officer over the discrepancy between the trial and suppression hearing testimony, the government could have rehabilitated the officer fairly easily. In doing so, the officer could have re-stated, repeated and explained a portion of his testimony that was clearly not helpful to the defendant and was not otherwise being emphasized by the government. The government mentioned Sullivan's alleged admission only in passing during opening and closing arguments. Under such circumstances, objectively reasonable defense counsel may have purposefully decided not to mention the alleged discrepancy.

(Filing No. 141 at p. 7.)

To start with, and unlike the finding in Judge Zwart's F & R, government counsel *did* focus on the admission, and not in "passing." During her opening statement, the prosecutor told the jury exactly what Parsons would say about Sullivan's alleged admission:

> When Mr. Sullivan -- During the traffic stop when Mr. Sullivan was seated in the deputy's vehicle, Deputy Parsons thought Mr. Sullivan was acting more nervous than what Deputy Parsons believed is the normal motoring public. So, Deputy Parsons said to Mr. Sullivan, "Do you have anything illegal in the vehicle?" And Mr. Sullivan said, "I have some K2." Then Deputy Parsons said, "Do you have anything else in the vehicle?" And Mr. Sullivan said, "Well, I have some bath powder." Then Deputy Parsons asked Mr. Sullivan for permission to search the vehicle. Mr. Sullivan said no.

(Filing No. 104, p. 9.)

In her initial closing argument, virtually the first words out of the prosecutor's mouth stressed the alleged *admission*:

> On October 27, 2010, Steve Sullivan was stopped for speeding by the Otoe County Sheriff's Office. He *admitted* to having something illegal in his vehicle, the K2, and when the deputy asked if he had anything else in his vehicle, he said I have some bath powder. And he did, a great big bag of it, 397 grams, just under a pound, about 14 ounces.

(Filing No. 104, p. 237 (emphasis added).)

Moreover, I am perplexed by Judge Zwart's statement that "[h]ad defense counsel attempted to impeach the officer over the discrepancy between the trial and suppression hearing testimony, the government could have rehabilitated the officer fairly easily." How could that be?

15

Parsons' sworn pretrial testimony, that could have been employed *as substantive evidence* of innocence at trial, was *completely* at odds with Parsons' trial testimony. No amount of "I was just confused, I didn't have my police reports" or some other lame excuse could have explained away Parsons' *sworn* pretrial testimony that Sullivan said he had nothing illegal in his care, including K-2[11] and bath salts.

In short, Shapiro's failure to attack Parsons with the wholly inconsistent sworn pretrial testimony was not a mere "oversight" (or some theoretical defense strategy that a hypothetical lawyer might have dreamed up). On the contrary, and objectively viewed, Shapiro's mistake did not fall within the range of reasonable professional assistance.

*Prejudice*

While the government had a relatively strong circumstantial evidence case, the law tells me that: "[A] defendant *need not* establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under *Strickland* ." *Kyles v. Whitley*, 514 U.S at 434 (citing *Nix v. Whiteside*, 475 U.S. at 175) (emphasis added). As the judge who presided over the trial, I am convinced that Sullivan's showing is compelling enough to "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

---

[11]To the extent that Judge Zwart believed that K-2 was "illegal" under federal law at the time of the stop, that was not the case. *See supra* n.5. Vigil admitted that K-2 was not illegal under Nebraska law as well. (Filing No. 104, p. 150.) Thus, any undue emphasis by the government on K-2 in order to "rehabilitate" Parsons would have been clear error, and I would have called the government up short. And, that is particularly so given the fact that Sullivan was not charged with a crime relating to K-2.

16

I don't have to look beyond the history of this case to find support for my finding and conclusion on the prejudice prong. When the Eighth Circuit ruled against Sullivan in his direct appeal, the Court of Appeals stressed that:

> A reasonable juror could find Sullivan knew he was in possession of a controlled substance analogue. When Parsons asked Sullivan whether the vehicle contained anything illegal, Sullivan told him the vehicle contained bath powder. Trial Tr. 183. At the time of the arrest, the mephedrone in the powder was illegal only under the CSAEA as a controlled substance analogue. . . . *Accordingly, Sullivan indicating the bath powder was illegal supports a reasonable inference he knew the powder contained a controlled substance analogue.*

[United States v. Sullivan, 714 F.3d at 1107](#) (emphasis added).

If, as is crystal clear, the Court of Appeals found Sullivan's "admission" compelling when evaluating the sufficiency of the evidence, there is no good reason why one should not infer that the jury also came to the same conclusion. Had the jury known that Parsons gave a sworn statement that Sullivan made no such admission, there is a reasonable probability that the outcome would have been different.

IT IS ORDERED:

1. After de novo review, and with the exception set forth in the following paragraph, I adopt Judge Zwart's F & R[12] (Filing No. [141](#), Grounds 4, 7, 9, 12, and 16[13]) regarding all claims of ineffective assistance of counsel,

---

[12] I do not necessarily adopt all of her findings and reasoning, however.

[13] Remember also that upon initial review, I dismissed Grounds 1, 2, 3, 5, 6, 10, 11, 13, 14, and 15 and refused to grant a certificate of appealability. (Filing No. [116](#)).

I dismiss those claims with prejudice, and I thank the judge for her hard work.

2. I respectfully reject Judge Zwart's F & R (Filing No. 141, Ground 8). I find and conclude that Mr. Shapiro provided ineffective assistance of counsel regarding the failure to impeach Officer Parsons respecting a sworn prior inconsistent statement, and that such failure undermines confidence in the jury verdict. I therefore grant the § 2255 motion (Filing No. 113), vacate Sullivan's conviction, and order the government to promptly return to Sullivan the money forfeited to the government.

3. Sullivan's objection (Filing No. 143) to the F & R is sustained in part and denied in part as provided herein.

4. A separate judgment[14] will be issued.

5. No certificate of appealability will be issued in favor of Sullivan for any claims that have been denied and dismissed.

DATED this 17th day of November, 2015.

BY THE COURT:
*Richard G. Kopf*
Senior United States District Judge

---

[14]Though I dismissed various claims upon initial review, I withheld judgment. Thus, the judgment contemplated by this order will be the only judgment in this case.